IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| D M HOPKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:21-cv-00217-RK |
| | ) | |
| CITY OF INDEPENDENCE, MISSOURI, | ) | |
| BRAD HALSEY, IN HIS INDIVIDUAL | ) | |
| AND OFFICIAL CAPACITY; JOSH | ) | |
| CANTERBURY, IN HIS INDIVIDUAL | ) | |
| AND OFFICIAL CAPACITY; CARTER | ) | |
| MCVAY, IN HIS INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY; AND SLADE | ) | |
| SHAFER, IN HIS INDIVIDUAL AND | ) | |
| OFFICIAL CAPACITY; | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER**

Before the Court is Defendants' motion for partial summary judgment. (Doc. 89.) The motion is fully briefed. (Docs. 90, 97, 104, 105.) For the reasons set forth below, the motion is **GRANTED** as to Counts One, Two, Four, and Five, and **DENIED** as to Counts Three and Six.

**I.  Background**

Plaintiff D. M. Hopkins filed this lawsuit after three police officers from the Independence Police Department responded to a 911 call she made indicating that she was suicidal. Plaintiff brings six claims:

- Count One is brought against Independence Police Officers Josh Canterbury, Carter McVay, and Slade Shafer (collectively, "Officer Defendants") for violation of 42 U.S.C. § 1983 for unlawful seizure.

- Count Two is brought against the Officer Defendants for violation of 42 U.S.C. § 1983 for false arrest.

- Count Three is brought against the Officer Defendants for violation of 42 U.S.C. § 1983 for excessive use of force.

- Count Four is brought against Independence Chief of Police Brad Halsey ("Chief Halsey") and the City of Independence, Missouri, for violation of 42 U.S.C. § 1983 for supervisory and municipal liability under *Monnell*.[1]
- Count Five is brought against the City of Independence, Missouri, for violation of 42 U.S.C. § 1983 for supervisory and municipal liability under *Canton*.[2]
- Count Six is brought against the City of Independence, Missouri, for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.*

Defendants seek summary judgment as to all of Plaintiff's claims except "allegations of excessive force that occurred beyond the viewable range of the in-dash video cameras."

### A. Uncontroverted Material Facts Relating to Incident of June 7, 2019[3]

On June 7, 2019, Independence Police Officers were dispatched on a call from Plaintiff, who stated in a 911 call that "I'm feeling really suicidal, and I've been feeling like this for the last couple of days." Plaintiff told the 911 dispatcher that she was at a Subway restaurant parking lot and had been there for two days. She also told the dispatcher that she tried to cut her wrists the day before and "today I'm thinking about taking all of my antidepressants." Plaintiff indicated she did not want police to arrive.

The Independence Police Department's procedure for calls like this one is for police to arrive first on the scene and make sure it is secure before ambulance personnel respond. Accordingly, the Officer Defendants responded to the call and eventually located Plaintiff in a parked vehicle in a parking lot.

Officers Canterbury and McVay were riding in the same car, and Officer Shafer traveled separately; both responding police cars were equipped with dash cam videos. The dash cam video of Officers Canterbury and McVay captured the police officers as they drove around searching for Plaintiff. After they located Plaintiff, the dash cam video also captured the interaction the three officers had with Plaintiff until she exits the vehicle and walks with paramedics outside the view of the camera. Officer Shafer's dash cam video and audio similarly captured the three police

---

[1] *Monell v. Dep't of Soc. Servs. Of the City of New York*, 436 U.S. 658, 691 (1978).
[2] *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989).
[3] The Court omits properly controverted facts, asserted facts that are immaterial to the resolution of the motion, asserted facts that are not properly supported by admissible evidence, and legal conclusions and argument presented as assertion of facts.

officers as they interacted with Plaintiff until she walks with paramedics outside the view of the camera. Both videos periodically only have audio without visual footage.

While talking with Plaintiff as she was sitting in the car, the officers asked Plaintiff why she had called 911. She responded, "because I'm feeling suicidal, that's it." When asked how many pills she had taken, Plaintiff responded, "not enough to kill me." The officers repeatedly asked Plaintiff to exit her car, but she said she wanted the officers to leave her alone and she did not comply. The videos reflect the officers telling Plaintiff, "you have to step out of the car, ok?"; "alright, can you step out of the car?"; "come on, step out"; "we need you to step out so we can get you your help you want"; "you can either step out or we're going to have to get you out." Plaintiff repeatedly told the officers, "I do not want your help," and asked them to leave. At one point, Officer McVay told Plaintiff to "step out, we don't want to drag you out," and "you can either step out or we are gonna [*sic*] get you out." Plaintiff states that she "refused repeated 'requests' from the police officers to get out of her car."

The parties dispute whether any of the officers touched Plaintiff while she was in the car. The video does not clearly show any of the officers touching Plaintiff, though they at times touch the car and a door is opened. Citing to the video evidence, Plaintiff maintains:

> One of the Defendant Officers put his hand on top of Plaintiff's car and was talking through her passenger window, and may have had his hands/arms inside of her car. Further, one of the Defendant Officers opened Plaintiff's driver door and physically touched Plaintiff to get out of the car. There may have been other physical touchings as depicted in the video.

Shortly after the police arrived on the call for service, three members of an ambulance crew operated by American Medical Response ("AMR") arrived. AMR paramedics approached Plaintiff while she was still sitting in her car and attempted to talk with her to get her to voluntarily exit the vehicle. Plaintiff had been told repeatedly that she was required to get out of the car and that she was not allowed to leave and was directed to go to the ambulance. Defendants describe Plaintiff as "voluntarily" getting out of her car, while Plaintiff states that "she did comply with [directives] (though it was not of her own volition)."[4]

---

[4] Though not necessary to the resolution of this motion, Officer Canterbury claims that both he and one of the AMR paramedics on scene made the decision that Plaintiff was not free to leave. Officer Shafer believes that the decision that Plaintiff was required to go to the hospital was made by AMR personnel. Officer Shafer never heard AMR personnel state that Plaintiff needed to go to the hospital.

Plaintiff then walked unassisted and without any physical contact until she was outside of the view of the dash cam video with paramedics walking on either side of her. Plaintiff alleges that Defendant Officers then severely beat her outside the view of the camera. Because Defendants are not moving for summary judgment based on facts not shown on the video from the camera, the Court does not include them here.

### B. Uncontroverted Material Facts Relating to Policies

In June 2019, the Independence Police Department had approximately 206 sworn police officers. While Defendant Brad Halsey was Chief of Police, each police officer was required to have graduated from an accredited police academy and be certified by the Peace Officer Standards and Training ("POST") operated by the Missouri Department of Public Safety. In addition, all newly hired police officers were required to work and ride with more experienced officers in a field training program.

On and before June 7, 2019, the day of the incident, the Independence Police Department had a general order concerning use of force. General Order No. 1994-009 was titled "Response to Force" and stated in part:

> The Independence Police Department recognizes and respects the value and special integrity of human life. Vesting officers with lawful authority to use force to protect the public welfare requires a careful balance of all human interests. A department member will use that force that is objectively reasonable given the totality of the circumstances to bring an incident under control or apprehend a subject(s).

During that time, the Independence Police Department also had a general order concerning how members of the police department should deal with members of the public who are or were suspected of being mentally ill. General Order 2004-003 was titled "Response to Mentally Ill Subjects/Crisis Intervention Team (CIT)" and stated in part:

> Department policy is to provide an effective response to situations involving subjects who are suspected of or are verifiably mentally ill, in order to avoid unnecessary violence and potential civil litigation and to ensure that proper medical attention is provided. A CIT program is in place to assist officers when dealing with mentally ill suspects.

The Independence Police Department provided training to its employees as to how to identify a situation involving a CIT or persons with a mental illness, though not all officers had a CIT certification from an outside agency (referred to as a "CIT officer"). If the Independence

Police Department had a call for service involving a CIT situation, it would try to send a trained CIT officer.

Also on and before June 7, 2019, the Independence Police Department had a general order concerning the operation of its Internal Affairs Unit, which was tasked with investigating allegations of police misconduct and reporting the results to the police chief. General Order No. 1994-027 is titled "Internal Affairs" and states in part:

> It is the policy of the Independence Police Department to ensure that the integrity of this department is vigilantly guarded by investigating all complaints alleging misconduct by an employee, sworn, or non-sworn. Complaints may be filed by the public or by employees of the department. All complaints will be investigated thoroughly, fairly, impartially, and expeditiously. In order to ensure public confidence, good order and discipline, while observing and protecting the individual rights of the employee, this order is hereby established.

Any allegation of misconduct could be reviewed by the Internal Affairs Unit. Alleged misconduct could range from an officer being rude to improper use of lethal force. The order described how investigations would be conducted. While Defendant Halsey was the police chief, the Internal Affairs Unit reported to him. Investigations could be based on reports submitted by citizens or by members of the police department. Defendant Halsey expected that if a department member observed misconduct by another member, a self-initiated report would be submitted to the Internal Affairs Unit. Chief Halsey further expected the unit to investigate all claims thoroughly. As police chief, Chief Halsey was responsible for reviewing each Internal Affairs investigation, and he had the final say on all complaints and investigations. In other words, if Chief Halsey believed an officer subject to an investigation acted in an inappropriate or unprofessional manner, in a manner inconsistent with his or her training, or in a manner in contravention of the department's policies and procedures, Chief Halsey had the authority to discipline the officer. Discipline could include counseling, additional training, suspension, and termination. Chief Halsey used the results of the Internal Affairs investigations to help him decide whether new or different training was necessary on a department-wide basis.

## II. Legal Standards

### A. Rule 56 of the Federal Rules of Civil Procedure

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The Court views the evidence "in the light most favorable to the nonmoving party and

giv[es] the nonmoving party the benefit of all reasonable inferences." *Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018) (citations and quotation marks omitted). "If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted." *Smith-Bunge v. Wis. Central, Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019) (citation omitted).

At the summary judgment stage, the movant must "support" its motion either by "citing to particular parts of materials in the record" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); Rule 56(c)(1). In resisting summary judgment, the nonmoving party may not rest on the allegations in its pleadings, but must, by affidavit and other evidence, set forth specific facts showing that a genuine issue of material fact exists. Rule 56(c); *see also Thomas v. Corwin*, 483 F.3d 516, 527 (8th Cir. 2007) (mere allegations, unsupported by specific facts or evidence beyond a nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment). In so doing, the nonmoving party "cannot create sham issues of fact in an effort to defeat summary judgment." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.*, 49 F.3d 399, 402 (8th Cir. 1995) (citation omitted). To controvert a factual position, the nonmoving party must "refer specifically to those portions of the record upon which [he] relies." *Jones v. United Parcel Serv., Inc.*, 461 F.3d 982, 990 (8th Cir. 2006) (citation omitted).

"When two opposing parties tell two different stories, one of which is blatantly contradicted by the record [(e.g., a videorecording)], so that no reasonable jury could believe it, a court should not adopt [the blatantly contradicted] version of the facts [(even if proffered by the non-moving party)] for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-81 (2007). Accurate videos of events in question can allow a court to determine what happened without weighing evidence. *White v. Jackson*, 865 F.3d 1064, 1077 (8th Cir. 2017) (noting that given "video and audio evidence" in the case, the court "need not accept [a party's] version of the facts"); *see also Michael v. Trevena*, 899 F.3d 528, 533-34 (8th Cir. 2018) (finding a genuinely disputed material fact precluded summary judgment on an unlawful arrest claim because the recordings were inconclusive and a jury could reasonably adopt either the officers' or the plaintiff's version of the facts).

### B. Qualified Immunity

In response to a claim under 42 U.S.C. § 1983, a defendant may assert the defense of qualified immunity. "The defense of qualified immunity gives government officials engaged in discretionary activities immunity from liability unless their conduct violates 'clearly established statutory or constitutional rights.'" *Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Officials are entitled to qualified immunity only to the extent that 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hedges v. Poletis*, 177 F.3d 1071, 1074 (8th Cir. 1999) (quoting *Harlow*, 457 U.S. at 818). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). It protects government officials from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (quotation omitted). Put another way, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 571 U.S. 3, 5 (2013) (internal quotations omitted). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Avalos v. City of Glenwood*, 382 F.3d 792, 798 (8th Cir. 2004) (internal quotation marks omitted).

The Court uses a two-part test to determine whether a government official is entitled to qualified immunity. *See Branch v. Gorman*, 742 F.3d 1069, 1072 (8th Cir. 2014). The first part is to determine "whether the facts alleged, construed in the light most favorable to [Plaintiff], establish a violation of a constitutional or statutory right." *Id.* The second part of this test is to determine "whether that right was clearly established at the time of the alleged violation, such that a reasonable officer would have known his actions were unlawful." *Id.*

### III. Discussion

#### A. Counts One and Two – Unlawful Seizure & False Arrest against Officer Defendants

In Count One, Plaintiff asserts a § 1983 claim for unlawful seizure. Plaintiff alleges in relevant part that the Officer Defendants seized Plaintiff by demanding she exit her vehicle, by grabbing and slamming her against the side of the ambulance, by slamming and pinning her to the

7
Case 4:21-cv-00217-RK    Document 108    Filed 04/11/24    Page 7 of 17

ground, and by directing an EMT to administer an injection. Plaintiff alleges that the officers "did not have a reasonable suspicion that Plaintiff had committed, was committing, or was about to commit a crime"; that "[a]ny interest the [Officer] Defendants may have had in carrying out the above-described acts to fulfill their 'community caretaking function' was far outweighed by Plaintiff's interest in [not] being subjected to the government intrusion imposed upon her by those seizures"; and that the scope of the encounter "vastly exceeded any community caretaking purpose."

Plaintiff alleges similar facts in Count Two, asserting a claim for false arrest. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Arrests are "seizures" within the meaning of the Fourth Amendment, and both require probable cause. *Lingo v. Burle*, No. 4:06-CV-1392 CAS, 2008 WL 2787703, at *3 (E.D. Mo. July 15, 2008) "A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Ohlson-Townsend v. Wolf*, 18-CV-4093-CJW-MAR, 2019 WL 6609695, at *5 (N.D. Iowa Dec. 5, 2019) (citation omitted). Put most simply, an arrest "supported by probable cause" does not violate the Fourth Amendment. *White*, 865 F.3d at 1074.

Officer Defendants argue in part that they were justified in detaining Plaintiff under the "community caretaking" function based on Plaintiff's expression of suicidal thoughts. Plaintiff claims instead that while the conversation from the dispatcher might have been grounds for the officers' initial contact, once the officers spoke with Plaintiff, they "knew: (1) Plaintiff was not suicidal, (2) Plaintiff was not a current danger to herself or others, and (3) she had a mental health disability[,]" and thus should have realized she was not in danger and allowed Plaintiff to move on.

In *Cady v. Dombrowski*, 413 U.S. 433 (1973), the Supreme Court recognized that police officers sometimes "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." 413 U.S. at 441. In that vein, the Eighth Circuit has held:

> [P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed community caretaking functions. These functions include seizing a citizen in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity. However, there are limits to the community

caretaking function. Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her community caretaking function and the individual's interest in being free from arbitrary government interference.

*Samuelson v. City of New Ulm*, 455 F.3d 871, 877 (8th Cir. 2006) (citations and quotation marks omitted).

The Supreme Court has since clarified that "there is no overarching 'community caretaking' doctrine." *Caniglia v. Strom*, 593 U.S. __, 141 S.Ct. 1596 at 1602 (2021). Key here, though, *Caniglia* "refrain[ed]" from addressing the standards governing "emergency seizures for psychiatric treatment, observation, or stabilization." *Id.* at 1601 (Alito, J. concurring). The Eighth Circuit concluded in 2021 that probable cause to believe that a person is mentally ill and dangerous to herself or others is the requisite standard "for an emergency mental-health evaluation to be reasonable." *Graham v. Barnette*, 5 F.4th 872, 885 (8th Cir. 2021).

When viewed in the light most favorable to Plaintiff, a reasonable jury could not find that the officers lacked probable cause to believe Plaintiff was dangerous to herself or others. It is uncontroverted that in the 911 call, Plaintiff said, "I'm feeling really suicidal, and I've been feeling like this for the last couple of days." She also told the dispatcher that she tried to cut her wrists the day before, and "today I'm thinking about taking all of my antidepressants." While talking with Plaintiff as she was sitting in a car in a public area, the officers asked Plaintiff why she had called 911, and she responded, "because I'm feeling suicidal, that's it." When asked how many pills she had taken, Plaintiff responded, "not enough to kill me." Based on this evidence, there is no genuine issue of material fact as to the reasonableness of the officers' actions of detaining Plaintiff while medical personnel arrived.[5]

Even assuming for the sake of argument that the seizure was otherwise unreasonable, Officer Defendants would be entitled to qualified immunity. The Eighth Circuit in *Graham* noted in 2021 that the "probable-cause standard was not clearly established in our jurisprudence, meaning the officers may be still entitled to qualified immunity even if they seized [the plaintiff]

---

[5] To the extent Plaintiff includes allegations that the Officer Defendants' actions of demanding she exit her vehicle, grabbing and slamming her against the side of the ambulance, slamming and pinning her to the ground, and directing an EMT to administer an injection caused the scope of the encounter to "vastly exceed[] any community caretaking purpose[,]" these are allegations of excessive force, rather than unlawful seizure/false arrest, and constitute a distinct violation of the Fourth Amendment.

without probable cause of dangerousness." 5 F.4th at 886-87. In other words, before the Eighth Circuit ruled in *Graham*, the case law in this circuit was ambiguous as to whether an officer needed only reasonable belief. *Id.* at 887.

"Reasonable belief is a less exacting standard than probable cause, and, to be reasonable, an officer's belief must be supported by specific, articulable facts." *Graham*, 5 F.4th at 888 (internal quotation marks omitted). Even if the articulated facts do not rise to the level of a probable cause showing, they will nonetheless support the lower standard of reasonable belief. *See Samuelson*, 455 F.3d at 878 (officers were reasonable in seizing citizen where his 911 call demonstrated he was incoherent and where he appeared to be hallucinating); *Lacy v. City of Bolivar*, 416 F.3d 723, 726 (8th Cir. 2005) (under Missouri statute, officers were reasonable in seizing citizen when he was known to have depression and threatened suicide and harm); *McDonald v. Lewis*, No. 05-0173 (PAM/JJG), 2006 WL 2088160, at *4 (D. Minn. July 25, 2006) (officers acted reasonably under Minnesota statute in detaining an individual reported to be attempting suicide with alcohol and pills where they saw alcohol and a pill container, and the individual's speech was slurred and her eyes were watery, glassy, and bloodshot). Key here, the officers' actions of detaining Plaintiff after her display of suicidal behavior did not violate a clearly established constitutional right such that a reasonable officer would have known his or her actions were unlawful. *Branch*, 742 F.3d at 1072; *see also Brown v. City of St. Louis, Mo.*, 40 F.4th 895, 903 (8th Cir. 2022) (The court reasoned that, "when determining whether an officer is entitled to qualified immunity, we account for objectively reasonable mistakes." The court found therefore that the defendant officers "had arguable probable cause to arrest and then initiate prosecution against [the plaintiff]," and clarified "it was not clearly established that doing so would violate [the plaintiff's] right to be free from unlawful seizure." The court emphasized that this was true even though the court in which the criminal case was prosecuted ultimately acquitted the plaintiff of the charge of disturbing the peace.)

Summary judgment is therefore granted as to Plaintiff's claims of unlawful seizure and false arrest asserted in Counts One and Two.

### B. Count Three – Excessive Force against Officer Defendants

In Count Three, Plaintiff asserts a claim for excessive force against Officer Defendants. Officer Defendants seek summary judgment on this claim only to the extent "an excessive force claim is presented concerning events occurring at Plaintiff's vehicle." (Doc. 90 at 16.) Defendants

concede that excessive force claims based on what occurred by the ambulance and which was not visually recorded by the dash cam videos are not appropriate for summary judgment in light of disputed material issues of fact between the parties as to what did or did not occur. (*Id.* at 17.) Plaintiff, however, expressly indicates in her summary judgment response that she "is not claiming excessive force as to the events at her vehicle," but that her excessive force claim is based on the force used which "occurred outside the camera view by the ambulance." (Doc. 95 at 51.)

Summary judgment is therefore denied as to the claim of excessive force in Count Three.

### C. Counts Four and Five – Supervisory and Municipal Claims against Chief Halsey and the City of Independence

Plaintiff brings supervisory and municipal claims of § 1983 liability against Chief Halsey and the City of Independence under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), in Count Four, and under *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989), in Count Five. As to the City of Independence, Plaintiff must demonstrate that the constitutional violation "resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Indep.*, 829 F.3d 695, 699 (8th Cir. 2016) (citations and quotation marks omitted). Similarly, as to Chief Halsey, Plaintiff must show that "he directly participated in the constitutional violation, or [] his failure to train or supervise the offending actor caused the deprivation[.]" *Tilson v. Forrest City Police Dep't*, 28 F.3d 802, 806 (8th Cir. 1994).

Plaintiff's Counts Four and Five do not allege that an official municipal policy resulted in the violations of Plaintiff's constitutional rights she claims. Rather, Plaintiff's supervisory and municipal claims are based on allegations of a pattern, practice, unofficial policy, and/or custom; and/or inadequate training and/or supervision. (Doc. 27 at ¶¶ 149-166, 173-180.)

#### 1. Unofficial Custom

To show an unofficial custom, a plaintiff must demonstrate:

> (1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Corwin*, 829 F.3d at 700 (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)).

Chief Halsey and the City of Independence argue that a viable claim based on an unofficial custom cannot survive on this summary judgment record, citing the existence of the City's standalone Internal Affairs Unit. (Doc. 90 at 18.) These defendants argue that "there was no deliberate indifference" because (1) the Internal Affairs Unit was tasked with the responsibility of investigating allegations of misconduct, (2) Chief Halsey had no reason to believe the Internal Affairs Unit was not doing its job thoroughly and completely, and (3) when allegations of misconduct were found to be substantiated, appropriate remedial action was taken against the subject officer. (*Id.* at 18-19.)

Plaintiff, on the other hand, argues that Chief Halsey and the City of Independence (1) allowed a custom where officers utilized "pain compliance up to and including deadly force" regardless of the underlying offense, and (2) allowed a custom where individuals who refuse to comply with officers' orders were subjected to "unnecessary beatings and detention as 'punishment' for their inadequate deference to the officers." (Doc. 95 at 49-50.)

In support of Plaintiff's custom theory, Plaintiff cites a portion of testimony from the deposition of Mark Kelsey, a Major over Special Operations with the Independence Police Department, in which Plaintiff's counsel was questioning Major Kelsey about various uses of force and whether those types of force would ever be acceptable forms of pain compliance:

> Q. . . . . Would kicking someone's head, so an officer kicking a suspect's head be an acceptable form of pain compliance?
>
> A. The situations, because I -- I need to know a lot more about a situation like that because obviously that would be a -- kicking somebody in the head is always dangerous, so.
>
> Q. It could be deadly?
>
> A. It could be.
>
> Q. So in certain situations, it may be an appropriate form of pain compliance?
>
> A. I'd have to know the situation. I mean --
>
> Q. Can you sit here today and say that kicking someone's head is never an appropriate form of pain compliance?
>
> A. I can't say that it would never.

(Doc. 104-11 at 15.) Plaintiff also cites to numerous use-of-force reports, as well as investigations, as supporting her custom or pattern theory of *Monell* liability.

The materials Plaintiff cites in support of her theory of a custom or pattern do not support a finding of deliberate indifference by Chief Halsey or the City of Independence, however. The reports and testimony offered by Plaintiff show that the defendants followed their policy regarding use of force on many occasions when force was used in interactions with subjects with various apparent mental states. The reports also show that when officers deviated from the methods prescribed in the official policy, the practice was for a report to be compiled and reviewed, and for the subject officer(s) to then be addressed in a manner Chief Halsey deemed appropriate (e.g., a verbal reminder, assignment to a training, or a reprimand) after considering the conduct and surrounding circumstances. All the cited reports were reviewed by multiple levels of supervisors who made their own determination of the correctness of the conduct and the course of action taken by the supervisor at the next step down. Even to the extent it could be argued that the response by Chief Halsey to the subject officer's conduct was not as punitive as Plaintiff perceives to be appropriate, on the whole, the materials Plaintiff cites would not permit a reasonable juror to find that Chief Halsey or the City of Independence were deliberately indifferent to or tacitly authorized a continuing, widespread, persistent pattern of unconstitutional misconduct by their employees. Further, even if Chief Halsey's or the City of Independence's actions ultimately proved "ineffectual" in curbing any misconduct by officers, their actions do not demonstrate deliberate indifference. *See Ottman v. City of Indep.* 341 F.3d 751, 761 (8th Cir. 2003).

The Court finds Plaintiff has not raised a genuine issue of material fact as to any pattern or custom of unconstitutional conduct to which Chief Halsey or the City of Independence was deliberately indifferent.

### 2. Failure to Train or Supervise

Similar to the unofficial custom standard, the standard of liability for failure to train or supervise police officers is deliberate indifference or tacit authorization of the offensive acts. *Tilson*, 28 F.3d at 807 (citing *City of Canton*, 489 U.S. at 388).

For Chief Halsey and the City of Independence to be liable under this theory, "the "municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Perkins v. Hastings*, 915 F.3d 512, 523 (8th Cir. 2019) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original) (citation omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference

for purposes of failure to train." *Id.* (quoting *Connick*, 563 U.S. at 62; and citing *Parrish v. Ball*, 594 F.3d 993, 1002 (8th Cir. 2010) (requiring "notice of a pattern of unconstitutional acts committed by subordinates" to establish a failure-to-supervise claim). "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick*, 563 U.S. at 62.

As set forth above, Plaintiff has not established a pattern of similar constitutional violations. Accordingly, the Court finds that Plaintiff has not raised a genuine issue of material fact as to a deliberately indifferent failure to train or supervise.

Summary judgment is therefore granted as to Plaintiff's *Monell*/*Canton* theories of liability against Chief Halsey and the City of Independence in Counts Four and Five.

### D. Count Six – Title II of the ADA, 42 U.S.C. § 12131 against City of Independence

In Count Six, Plaintiff alleges that she suffers from one or more mental impairments, including bipolar disorder, which substantially affects her major life activities (sleeping, caring for herself, concentrating, thinking, working, and communicating). Plaintiff claims the City of Independence discriminated against her due to her disability by arresting her; engaging in excessive force; subjecting her to scrutiny and unfair treatment due to her disability; failing to make appropriate efforts to determine whether her conduct or behavior was a result of a disability; failing to modify policies, practices, and/or procedures that result in the arrest and/or abuse of individuals with disabilities; and failing to train officers in appropriate and reasonable practices, and/or failing to follow such training.

The ADA prohibits the "exclu[sion] from participation," the "den[ial of] the benefits of the services, programs, or activities of a public entity," or "discrimination by any such entity" based on the disability of a qualified individual. § 12132. The ADA defines "public entit[ies]" as including "any department, agency, . . . or other instrumentality of a State or States or local government." § 12131(1)(B). "A plaintiff under Title II of the ADA must . . . show [1] that [s]he is a qualified individual with a disability [2] denied participation in, or the benefits of, the services, programs, or activities of a public entity [3] because of his disability." *Gorman v. Bartch*, 152 F.3d at 912.

The City of Independence does not contest Plaintiff's allegations that she suffers from one or more mental impairments, including bipolar disorder, that substantially affect her major life activities. Defendant's argument for summary judgment discusses only Plaintiff's allegations (1) that because of her disability she was wrongfully arrested, detained, and subjected to excessive force, and (2) that the City of Independence failed to train officers in appropriate and reasonable practices.[6] The City of Independence asserts as to Plaintiff's "'wrongful arrest' ADA claim" that "liability may attach if the officers unreasonably mistake an innocent, disability-related behavior for criminal conduct." The City of Independence contends that Plaintiff has no evidence that it acted with the requisite deliberate indifference to support her failure-to-train claim under the ADA. The City of Independence argues that the ADA does not apply to interactions between law enforcement personnel and disabled individuals prior to officers securing the scene and ensuring there is no threat to human life. In this vein, the City of Independence contends that the earliest the scene was secured was when Plaintiff was escorted from her car by AMR ambulance personnel, and thus, "the initial interaction between the officers and Plaintiff and her detention cannot form the basis of a viable ADA claim."

In making this argument, the City of Independence primarily relies on *Roberts v. City of Omaha*, 723 F.3d 966 (8th Cir. 2013). As a factual matter, however, this case is distinguishable from *Roberts*, which applied the "wrongful arrest" theory of ADA liability, which is based on officers "unreasonably mistak[ing] an innocent, disability-related behavior for criminal conduct." *Roberts*, 723 F.3d at 973. In *Roberts*, the plaintiff seeking to recover damages was arrested solely for conduct perceived as criminal by law enforcement that was in actuality a function or outcome of the plaintiff's disability. Specifically, the ADA claim in *Roberts* arose after police officers shot and killed an individual after he refused officers' commands to lie down on the floor and drew a knife, stabbing at the officers while they attempted to physically restrain him when he was having a psychotic episode having been diagnosed with a mental disability and paranoid schizophrenia. *Roberts*, 723 F.3d at 970.

---

[6] The City of Independence does not specifically challenge Plaintiff's allegations that it violated Title II of the ADA by subjecting her to scrutiny and unfair treatment due to her disability; failing to make appropriate efforts to determine whether her conduct or behavior was a result of a disability; failing to modify policies, practices, and/or procedures that result in the arrest and/or abuse of individuals with disabilities; or failing to follow training in appropriate and reasonable practices.

*Roberts* ultimately does not support Defendants' argument that the ADA does not apply to interactions between law enforcement personnel and disabled individuals prior to officers securing the scene and ensuring there is no threat to human life. In particular, the Eighth Circuit expressly held in *Roberts* that the ADA <u>does</u> "apply to law enforcement officers taking disabled suspects into custody." 723 F.3d at 973; *see also Sheeley v. City of Austin*, No. 12-2525 ADM/SER, 2015 WL 3576115, at *8 (D. Minn. June 5, 2015) ("The Eighth Circuit has not issued a similarly broad holding on the ADA's applicability prior to an arrest" contrasting with a Fifth Circuit holding that the ADA does not apply to "an officer's on-the-street responses . . . prior to the officer's securing the scene and ensuring that there is no threat to human life").

Instead, the law of the Eighth Circuit is that

> inquiry into whether officers reasonably accommodated the individual is highly fact-specific and varies depending on the circumstances of each case, including the exigent circumstances presented by criminal activity and safety concerns and that [the courts] will not second guess an officer's judgments, where an officer is presented with exigent or unexpected circumstances.

*De Boise v. Taser Int'l, Inc.*, 760 F.3d 892, 899 (8th Cir. 2014) (cleaned up).

The Court rejects the City of Independence's argument that the ADA does not apply to any interactions between law enforcement personnel and disabled individuals prior to officers securing the scene and ensuring there is no threat to human life. The Court finds that Eighth Circuit precedent requires a more nuanced inquiry. In light of the facts in dispute at this juncture and the City of Independence's decision not to address many of Plaintiff's allegations supporting her ADA claim, the Court finds that the City of Independence is not entitled to summary judgment on Plaintiff's ADA claim in Count VI.[7]

---

[7] Although the City of Independence briefly mentions the failure to train aspect of Plaintiff's ADA claim, the extent of their argument on the issue is that a showing of deliberate indifference is required, and, "[f]or the reasons previously discussed, there is no evidence that the City acted with the requisite deliberate indifference." The City of Independence reiterates that Chief Halsey "reviewed the [internal affairs] investigations and took remedial measures against the involved police officers when they were called for." This conclusory argument does not meaningfully address any interaction between the ADA and the use-of-force reports and investigation reports in the summary judgment record.

## IV. CONCLUSION

For the foregoing reasons and after careful consideration, the Court **GRANTS** summary judgment as to Counts One, Two, Four, and Five, and **DENIES** summary judgment as to Counts Three and Six.

**IT IS SO ORDERED**.

s/ Roseann A. Ketchmark
ROSEANN A. KETCHMARK, JUDGE
UNITED STATES DISTRICT COURT

DATED: April 11, 2024